UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MAHMOOD AKHTAR,                                    :
                                                   :        **DECISION & ORDER**
                          Plaintiff,               :        19-CV-1422 (WFK) (RER)
                                                   :
           v.                                      :
                                                   :
VITAMIN HERBAL HOMEOPATHIC                          :
CENTER INC., IFTIKHAR CHOUDRY, and                 :
TAYYABA KUNWAR,                                    :
                                                   :
                          Defendants.              :
----------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**  Mahmood Akhtar ("Plaintiff")
commenced this action on March 12, 2019, bringing claims under §§ 1584, 1589, 1590, 1592,
1593(A) and 1595 of the Trafficking Victims Protection Reauthorization Act ("TVPRA") and §
215 of the New York Labor Law ("NYLL").  *See* Complaint, ECF No. 1; 18 U.S.C. §§ 1584,
1589, 1590, 1592, 1593A, 1595; NYLL § 215.  Defendants are Plaintiff's former employers,
Vitamin Herbal Homeopathic Center, Inc. ("VHC") and Iftikhar Choudry and Tayyaba Kunwar,
husband and wife who owned and operated VHC.  Plaintiff alleges Defendants subjected him to
oppressive working conditions for fifteen years and coerced Plaintiff into continued employment
through isolation, threats of violence against Plaintiff and his family, deportation, and arrest.
Defendant Kunwar now moves for summary judgment seeking to dismiss the claims only as they
are asserted against her.  For the reasons stated below, Defendant Kunwar's motion for summary
judgment is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Facts

The following facts are drawn from the parties' Local Rule 56.1 Statements, declarations,

deposition testimony, and other evidence submitted in support of the motion.  Fed. R. Civ. P.

56(c).  *See generally* Defs.' Local Civil R. 56.1 St. of Undisputed Facts (Defs.' St.), ECF No. 47-

1; Pl.'s Response to Defs.' Undisputed Facts (Pl.'s Rsp.), ECF No. 49.  The facts are undisputed

or construed in the light most favorable to the Plaintiff, the non-moving party, "with all factual

ambiguities resolved and all reasonable inferences drawn in his favor."  *Capobianco v. City of*

*New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

Mahmood Akhtar ("Plaintiff") was born in Pakistan in 1957.  Defs.' St. ¶ 1.  Plaintiff is a

gay man.  *Id.* ¶ 22.   Plaintiff recalls that growing up in Pakistan he was subjected to ridicule and harassment on account of his sexual orientation.  *Id.* ¶ 6; Declaration of Mahmood Akhtar ("Pl.'s Decl."), ECF No. 50, ¶ 3.  While living in Pakistan in the mid-1980's, Plaintiff's partner was killed.  *Id.*  In the wake of the attack, Plaintiff's family arranged for him to leave Pakistan.  Defs.' St. ¶¶ 4,5.  Plaintiff originally travelled to Los Angeles, where he stayed for approximately two weeks before settling in New York.  *Id.* ¶¶ 8,9.  Plaintiff applied for admission to the United States and by order dated September 3, 1991, his application was denied, and Plaintiff was ordered excluded from the United States.  *Id.* ¶ 8.  Despite the exclusion order, Defendant remained in the United States working several different jobs.  *Id.* ¶ 10.

In 1996, Plaintiff travelled to Canada where he remained for approximately two years.  *Id.* ¶ 12.  Plaintiff then received Canadian "landing papers," which the parties describe as the equivalent of a United States Green Card.  Plaintiff's Deposition Transcript (Pl.'s Dep."), ECF No. 45-6 at 45:5-16.  Shortly thereafter he returned to the United States.  Approximately six months after his return to the United States, Plaintiff returned to Pakistan to visit an ill sister.  Defs.' St. ¶ 14.  Plaintiff alleges he stayed almost entirely in his family's home during this visit to Pakistan because of the risk to his life in the country.  Pl.'s Dep. at 47:24-49:10.  Plaintiff then returned to the United States.  Defs.' St. ¶ 17.

In 1998, when Plaintiff was back in the United States, he received a telephone call from Defendant Choudry asking if Plaintiff would be interested in working for VHC, a homeopathy products store in Queens, New York that Choudry owned and operated.  *Id.* ¶ 19.  Choudry had received Plaintiff's contact information from one of Plaintiff's previous employers.  *Id.*  Plaintiff and Choudry arranged for Plaintiff to come to the store for an interview.  *Id.* ¶ 21.  Plaintiff alleges that when he arrived, Choudry was present, but his wife, Defendant Kunwar was not.

Plaintiff alleges that Choudry then insisted on waiting for Kunwar to arrive before proceeding with the interview and that when she did arrive—approximately two hours after the interview was scheduled to begin—the interview commenced.  Pl.'s St. ¶ 20.  Kunwar denies she was present for the interview.  Defs.' St. ¶ 21.

The parties set forth very different characterizations of Kunwar's role in VHC.  Plaintiff maintains VHC was jointly owned and operated by Choudry and Kunwar and that while Choudry managed VHC's day-to-day operations, Kunwar came into the store "once or twice a week."  Pl.'s Dep. at 145:15, 155:2.  Plaintiff also testified that when Kunwar came into the store, she would say "do this in such a way, do that in such a way, this is where you should clean and you didn't clean properly, something like that."  *Id.* at 155:8.  Further, Plaintiff points out that VHC's Certificate of Incorporation on record with the New York Department of State identifies Kunwar as the filer and that VHC's Biennial Statements filed with the state for 2005, 2007, 2009, and 2011 all identify Kunwar as VHC's President.  *See* Plaintiff's Exhibits 3–7, ECF Nos. 51-3, 51-4, 51-5, 51-6, 51-7.  Kunwar maintains she "had no ownership interest or role whatsoever in the business."  Affidavit of Tayyaba Kunwar ("Kunwar Aff."), ECF No. 45-2 ¶ 2. Kunwar maintains she had "virtually no contact with Plaintiff, never paid him or supervised his employment."  *Id.*  Kunwar alleges that her husband must have forged her signature on VHC's corporate documents "to avoid questioning from creditors" during his ongoing personal bankruptcy proceedings.  *Id.* ¶¶ 17, 18.

Plaintiff maintains that his immigration status and sexual origination were discussed during his initial interview with Defendants.  Pl.'s St. ¶¶ 22–23; Pl.'s Dep. at 58:24-60:20. Plaintiff alleges that Kunwar said, "we know who you are" to Plaintiff at the end of the interview, referencing his sexual orientation.  *Id.*  Plaintiff further alleges that both Choudry and

Kunwar advised him that it was "illegal to be gay" in America and cautioned him not to reveal his sexual orientation to anyone. *Id.* Plaintiff alleges Defendants warned him if he disclosed his sexual orientation, they would be forced to report him to authorities, which would result in his deportation. *Id.* at 74:7-13 ("Q: Can you specifically tell me what, if anything, prevented you from quitting your job at VHC? A: Okay, in the beginning they told me that if you tell this to anyone, that you are a gay, we will tell that immigration and we call the police and we will get you deported."). Plaintiff also alleges Defendants told him the American and Canadian immigration systems were linked by a common computer system and that deportation from American would result in deportation to Pakistan, not Canada. Pl.'s Decl. ¶ 13.

Plaintiff recalled that two weeks after the initial interview, Choudry instructed Plaintiff to return for a second interview. Pl.'s Dep. at 65:9-21. At the second interview, where both Defendants were again present, they informed Plaintiff they were willing to hire him and would pay him $400 for approximately fifty-three hours of work per week. *Id.* at 66:11-15. Plaintiff testified that he felt uneasy about Defendants, but voluntarily accepted the offer of employment anyway. *Id.* at 60:10-12. Plaintiff's employment with VHC began one week later. *Id.* at 65:20-22.

When Plaintiff first started working at VHC he lived with roommates in Brooklyn. *Id.* at 86: 12-17. Soon after, Plaintiff alleges Choudry arranged for him to move into an apartment in Jackson Heights near VHC. *Id* at 92: 9-25. Choudry helped Plaintiff find the apartment and Choudry maintained his own set of keys. *Id.* at 101: 2-21. Plaintiff testified at his deposition that Choudry also brought women to the apartment, and that for a short period Choudry "forcefully kept" a woman from India in the apartment because "his wife refused to keep her in the house." *Id.* at 104:22-25, 109:14-19. Kunwar maintains she was not involved in the process

4

of finding Plaintiff's living arrangements and never visited the apartment, and Plaintiff testified Choudry said "whatever you see, don't tell my wife." *Id.* at 100:20-22, 105:13.

Less than two months into Plaintiff's employment at VHC, Choudry and Kunwar travelled to India for 2–3 months and left Plaintiff to take care of running the store—requiring Plaintiff to arrive before the store opened and remain until after closing, seven days a week. Defs.' St. ¶ 26.  Defendants paid him $500 per week for this work, drawn directly from cash in the store cash register. *Id.* ¶ 27.  Plaintiff maintains that he was required to work seven days a week for the next fourteen years and was not permitted time off for holidays or medical appointments.  Pl.'s Dep. 198:8-22.

Plaintiff also testified that Defendants then began requiring him to perform domestic services in their home.  Defs.' St. ¶¶ 59–61.  Plaintiff alleges that Kunwar asked Plaintiff to cook, clean, do laundry, help organize parties for Defendants' friends, and massage her. *Id.* Defendant Kunwar adamantly denies any involvement in directing Plaintiff to perform domestic services.  Kunwar Aff. ¶¶ 14–15 ("I never invited the Plaintiff to my home. It was my husband who did so.  The Plaintiff has never worked at my house.  He has never cleaned, mopped, done laundry or cooked in my kitchen.  He was a guest at several parties, and was treated in the same manner as any other guest.").

Plaintiff was fired for a four-day period in 2001.  Defs.' St. ¶ 48.  When he was fired, Plaintiff alleges he feared Defendants would act on their threats to deport him, endanger his family, and expose him for being gay.  Pl.'s Dep. at 123:13-23.  He therefore approached Kunwar and asked to return to work.  Defs.' St. ¶ 49.  Kunwar agreed. *Id.*  Plaintiff returned to work and continued to work for Defendants for another twelve years. *Id.*  at 118:9-14.

Plaintiff alleges that Choudry physically abused him. *Id.* at 208:313 ("Q: Could you

please describe what kind of physical abuse you suffered by Mr. Choudry A: Okay, whenever he will walk past me he will kind of backslap me and use some kind of curse on me.  And then there was a cat who was allowed to come into the store, he will throw a footwear on me and say I threw it from cat.").  Plaintiff testified that Kunwar never physically abused him, but regularly addressed him using homophobic slurs and threatened to have him deported.  *Id.* at 207:21; 210:4.

Plaintiff alleges that throughout his 15-year employment with Defendants, both Choudry and Kunwar repeatedly threatened and intimidated Plaintiff into remaining in their employ.  *Id.* at 116:2-13; 211:4-8.  Specifically, Plaintiff recalled an incident in which Kunwar warned Plaintiff that Choudry was a "violent and dangerous man" that had "killed his brother," so Plaintiff should be careful not to make him mad.  Pl.'s Decl. ¶ 12.

Plaintiff also alleges Defendants used their knowledge of his sexual orientation to make Plaintiff believe that failure to work as they requested could endanger his family in Pakistan.  For example, Plaintiff alleges Defendants threatened to tell Plaintiff's brothers-in-law that he was acting upon his sexuality, which both parties understood would lead to violence against Plaintiff's sisters in Pakistan.  Pl.'s Dep. at 116:2-13.  Plaintiff also maintains that he believed and trusted Defendants when they told him "being gay in the United States was illegal."  *Id*. at 77:9-13.  Defendants challenge this assertion as implausible.  They point to the fact that Plaintiff had close gay friends, some of whom were gay activists who would be aware that it was in fact not illegal to be gay in America.  Defs.' Mem. in Support of Motion for Summary Judgment ("Defs.' Mem."), ECF No. 45-1 at 1.

Plaintiff also testified that between 2002 and 2008, Choudry took possession of Plaintiff's Canadian passport.  Pl.'s Dep. at 163:13-19; 164:16-20.  Plaintiff alleges that

following an incident with the police, Choudry returned his passport. *Id.* at 165:18. Plaintiff

stated he never discussed Choudry's possession of the passport with Kunwar and Kunwar

maintains she was not aware of her husband's possession of the passport and had no involvement

in its seizure from Plaintiff. *Id.* at 166:19-25; Defs.' Mem. at 7–8.

In November 2013, after fifteen years of employment with Defendants, Plaintiff was

fired. Defs.' St. ¶ 69. Two years later, in 2015, Plaintiff retained counsel and filed a claim with

the New York State Department of Labor ("DOL") alleging Defendants failed to pay his full

wage and overtime pay during his employment. Pl.'s Decl. ¶ 15. Approximately one year later,

the DOL made an initial finding that VHC owed Plaintiff for unpaid wages, overtime, and spread

of hours. *Id.* Plaintiff ultimately settled these claims with Defendants, with VHC agreeing to

pay Plaintiff $39,315.50. *Id.* While these claims were pending with the DOL, Plaintiff alleges

Defendants engaged in a concerted effort to intimidate and harass him. *Id.* ¶ 16. Specifically,

Plaintiff alleges Choudry showed up unannounced at Plaintiff's new store and "glared at him in a

threatening manner." *Id.* Plaintiff also alleges, Choudry prevented suppliers and advertisers

from working with him. *Id.* As a result, Plaintiff filed a retaliation claim with the DOL. *Id.* The

DOL investigated the claims and concluded Defendants had in fact retaliated against Plaintiff.

*Id.*; Pl.'s Ex. 9, ECF No. 51-9.

## II.   Procedural History

Plaintiff commenced this action on March 12, 2019 asserting violation of the TVPRA

regarding the conditions of his employment at VHC and NYLL alleging Defendants retaliated

against him for filing a claim with the DOL. *See generally,* Compl. On September 17, 2020,

Defendants filed the instant motion for summary judgment seeking to dismiss the claims as

asserted against Kunwar. ECF No. 45. No motion for summary judgment has been made with

respect to the claims asserted against Choudry.  The basis for Defendant's motion is that Kunwar had no involvement in the day-to-day operations of VHC.  Defs.' Mem. at 17. Kunwar alleges she was not an owner, officer, or employee of VHC and had very little interaction with Plaintiff and that she has been "cruelly brought into this action solely on the basis of being Choudry's wife."  Defs.' Mem. at 5.  Plaintiff characterizes Kunwar's involvement quite differently, alleging she was actively involved in ordering him to do things, including providing domestic services in Defendant's home.  Pl.'s Mem. at 1.  Plaintiff further alleges, Kunwar materially benefited from Plaintiff's forced labor, which in and of itself, provides liability under the TVPRA.  *Id.*  For the reasons below, Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" by citation to materials in the record.  Fed. R. Civ. P. 56(a)–(c).  A genuine dispute exists if a reasonable jury could find in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).  Courts must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant" when evaluating summary judgment motions.  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation and internal quotation marks omitted).  The role of the district court is not to weigh the evidence and to determine the truth of the matter, but rather to answer "the threshold inquiry of determining whether there is the need for a trial."  *Anderson*, 477 U.S. at 249–50.

If the moving party carries its preliminary burden, the burden shifts to the non-movant to

raise the existence of "'specific facts showing that there is a genuine issue for trial.'" *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 168 (E.D.N.Y. 2009) (Wexler, J.) (quoting *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "The mere existence of a scintilla of evidence" in support of the non-movant will not alone defeat a summary judgment motion.  *Anderson*, 477 U.S. at 252.  Rather, the non-moving party must make a showing sufficient to establish the existence of each element constituting its case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("[A] complete failure of proof concerning an essential element of the nonmov[ant]'s case necessarily renders all other facts immaterial.").  Conclusory statements, devoid of specifics, are insufficient to defeat a properly supported motion for summary judgment.  *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

## DISCUSSION

The Trafficking Victims Protection Reauthorization Act (the "TVPRA") was enacted in 2000, and the amendment creating a right of action, codified at 18 U.S.C. § 1595, was enacted in December 2003 and amended in December 2008.  *See Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) (citing Pub. L. No. 108-193, § 4(a)(4), 117 Stat. at 2877; Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067 (2008)).  From 2003 to 2008, the right to a civil action under §1595 was limited to only to the most extreme human trafficking conduct.  The right to a civil action was then extended in 2008 and now provides that an individual who is a victim of forced labor, trafficking or involuntary servitude "may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)."  18 U.S.C. § 1595.  The civil remedy provision of the TVPRA does not apply

retroactively to conduct which occurred before the effective date. *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011). Therefore, liability lies for Plaintiff's § 1584 and § 1592(a) claims only for conduct that occurred after 2008, and for all other claims, only for conduct that occurred after 2003.

Plaintiff asserts claims under the following sections of the TVPRA: 1584 (involuntary servitude), 1589 (forced labor), 1590 (trafficking), 1592(a) (document servitude) and 1593A (improper benefiting). Plaintiff also alleges Defendants engaged in a conspiracy to commit these violations. Finally, Plaintiff alleges Defendants violated § 215 of the New York Labor Law ("NYLL"). The Court takes each of Plaintiff's claims in turn.

## I.     Plaintiff's Involuntary Servitude Claim Under the TVPRA

Defendant Kunwar first moves for summary judgment on Plaintiff's involuntary servitude claim. Section 1584 of the TVPRA imposes liability on anyone who "knowingly and willfully holds to involuntary servitude . . . any other person for any term, or brings within the United States any person so held." The Supreme Court has defined "involuntary servitude" under this section as "a condition of servitude in which the victim is forced to work for a defendant by use of threat of physical restraint or injury or by use of coercion through law or legal process." *United States v. Kozminski*, 487 U.S. 931, 952 (1989). The Second Circuit has rejected the argument that "involuntary servitude" is "limited to chattel slavery-like conditions." *McGarry v. Pallito,* 687 F.3d 505, 510 (2d Cir. 2012). Rather, § 1584 is violated by the creation of "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Id.* at 511 (quoting *Kozminski,* 487 U.S. at 952).

Defendant Kunwar argues this claim against her must be dismissed because Plaintiff

admits Kunwar never physically abused him.  However, an involuntary servitude claim does not require actual physical abuse.  *Id.* at 952–53.  Instead, plaintiffs can show they were forced to work by use of (1) threat of physical injury, or (2) threat of coercion through law or the legal process.  *Id.*  Plaintiff testified under oath that Kunwar threatened him with physical injury if he did not follow her or her husband's orders.  Specifically, Plaintiff testified that Kunwar stated her husband was a "violent and dangerous man" who had "killed his brother" and that Plaintiff should be careful "not to make Choudry mad."  Pl.'s Decl. ¶ 12.  A reasonable person in Plaintiff's position could view these statements as threats of physical violence sufficient to compel continued involuntary servitude.

Moreover, Plaintiff testified that Kunwar consistently threatened to have Plaintiff deported.  Plaintiff testified that Kunwar told him it was "illegal to be gay" in America and suggested that he would be deported if he disobeyed Defendants.  A reasonable jury could determine such threats establish coercion through law or legal process.  *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008); *see also Kozminski,* 487 U.S. at 948 ("[T]hreatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude.").

In opposition, Defendant Kunwar points to the fact that Plaintiff had a Canadian passport and voluntarily went to Pakistan around 1998.  However, returning to a country lawfully and being "subject to deportation" are distinguishable.  *Shukla v. Sharma*, 07-CV-2972, 2012 WL 481796 (E.D.N.Y. Feb. 14, 2012) (Amon, C.J.) ("Defendants argue that the threat of deportation was not sufficient because plaintiff testified that he wanted to return to India . . . But returning to India lawfully and being subjected to deportation are clearly distinguishable.").  Plaintiff could

have felt compelled to continue working for Defendants because of their deportation threats, even if he was willing to travel to Pakistan voluntarily.

Further, Defendant Kunwar argues Plaintiff could not reasonably have believed it was "illegal to be gay" in America, and that the types of threats he alleges Defendants made, could not actually have been sufficient to compel continued employment.  These arguments amount to challenges to Plaintiff's credibility.  However, "'[i]t is . . .  well established that [a summary judgment] motion should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues of credibility.'"  *Katz v. Beil,* 142 A.D.3d 957, 964 (2d Dep't 2016).  "[A]ssessments of credibility[,] choices between conflicting versions of events," and "[a]ny weighing of evidence [are] the prerogative of the finder of fact, not an exercise for the court on summary judgment."  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

A reasonable jury could conclude—after hearing all of the record evidence—that Defendant Kunwar's conduct violated the TVPRA's involuntary servitude provisions.  18 U.S.C. § 1584.  Because material factual disputes exist, Defendant Kunwar's motion for summary judgment on Plaintiff's involuntary servitude claim against Defendant Kunwar is DENIED.

## II.    Plaintiff's Forced Labor Claim Under the TVPRA

Plaintiff also raises a forced labor claim under the TVPRA.  18 U.S.C. § 1589.  Section 1589 provides for liability against any person who provides or obtains the labor or services of a person "by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; . . .  by means of the abuse or threatened abuse of law or legal process; or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious

harm or physical restraint." 18 U.S.C. § 1589.   Section 1589 was intended to broaden the

punishable conduct under the TVPRA beyond was constitutes involuntary servitude under §

1584.  *Walia v. Veritas Healthcare Sols., L.L.C.*, 13-CV-6935, 2015 WL 4743542, at *4

(S.D.N.Y. Aug. 11, 2015) (Failla, J.) ("Congress created 18 U.S.C. § 1589 specifically

to broaden victims' protection beyond the slavery-like conditions prohibited by Section 1854.").

A defendant is liable under this section when he or she "knowingly provides or obtains

the labor or service of a person":

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).  Serious harm, for purposes of § 1589(a)(2), is defined as "any harm,

whether physical or nonphysical, including psychological, financial, or reputational harm, that is

sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of

the same background and in the same circumstances to perform or to continue performing labor

or services in order to avoid incurring that harm.  18 U.S.C. § 1589(c)(2).  Section 1589 is

"intended to address serious trafficking, or cases where traffickers threaten harm to third persons,

restrain their victims without physical violence or injury, or threaten dire consequences by means

other than overt violence."  *United States v. Dann*, 652 F.3d 1160, 1168 (9th Cir. 2011)

(emphasis added) (internal quotation marks omitted).

When considering whether an employer's conduct was sufficiently serious to coerce the

victim to provide labor or services against her will, the Court must also "consider the particular

vulnerabilities of a person in the victim's position."  *United States v. Rivera*, 799 F.3d 180, 186

(2d Cir. 2015). "The correct standard is a hybrid." *Id.* It requires victim's "acquiescence be *objectively reasonable* under the circumstances." *Id.* at 186–87 (emphasis added).

Typically, "forced labor" involves squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are "used to prevent [vulnerable] victims from leaving and to keep them bound to their captors." *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015); *see, e.g.*, *United States v. Sabhnani*, 599 F.3d 215, 224–32 (2d Cir. 2010) (affirming forced labor convictions where victims, who did not speak English and did not know how to drive or use a telephone, were, among other things, brought into the United States illegally, forced to sleep on the floor, dressed in rags, provided inadequate food, and threatened with arrest).

In addition, "[s]ection 1589 contains an express *scienter* requirement." *Calimlim*, 538 F.3d at 711. There must be evidence from which the jury could find "that the employer *intended* to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work." *Dann*, 652 F.3d at 1170 (emphasis added).

"[N]ot all bad employer-employee relationships or even bad employer-immigrant . . . relationships will constitute forced labor." *Id.*; *cf. United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014) (noting that "we should not—without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime"); *United States v. Bradley*, 390 F.3d 145, 154 (1st Cir. 2004) (noting distinction between "merely abusive employers" and

employers who "deliberately sought to compel forced labor").

This Court is satisfied that a jury could reasonably find Kunwar liable for forced labor under the TVPRA.  The threats of physical abuse and abuse of legal process described in respect to Plaintiff's involuntary servitude claims are sufficient to establish liability under § 1589, which was intended to broaden liability under the TVPRA to conduct that did not rise to the level of involuntary servitude.  Section 1589 also addresses circumstances where Defendants "threaten to harm third persons" to compel the victim to at in accordance with the employer's demands.  *See Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 437 (E.D.N.Y. 2017) (Gershon, J.) quoting H.R. Rep. No. 106-939, Sec. 12 at 101 (2000) (Conf. Rep.).  Plaintiff testified that Kunwar repeatedly warned him that if he did not do as he was told, she would "let [his] family know what [he was] are doing," which the Plaintiff alleges he understood to be a threat that Defendants would tell his family he was acting on his sexuality.  Kunwar demonstrated her capacity to fulfill this threat, by visiting Plaintiff's family in Pakistan.  Pl. Dep. at 116:5-11.  Plaintiff alleges that these threats compelled him to remain under Defendant's control for fear of retaliation against his sisters in Pakistan.  Pl.'s Decl. ¶ 4.

Other courts have found that the threat of deportation alone may support a claim for forced labor.  *See Shukla*, 2012 WL 481796, at *4 ("The threat of deportation may itself constitute a threat sufficient to satisfy the second element of forced labor."); *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (finding that threats to, among other things, fire plaintiffs, sue them, allow their visas to expire, or deport them sufficiently stated a claim for forced labor); *United States v. Garcia*, 02-CR-110S-01, 2003 WL 22956917 at*4 (W.D.N.Y. Dec. 2, 2003) (Schroeder, Mag.) (holding that threatening deportation "clearly fall[s] within the concept and definition of 'abuse of legal process' since the alleged

objective for [such conduct] was to intimidate and coerce [the plaintiffs] into 'forced labor'"

(citations omitted)); *see also Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 444

(E.D.N.Y. 2013) (Brodie, J.).

Considering Plaintiff's particular vulnerabilities, a jury could find it was objectively

reasonable that Plaintiff felt compelled to remain in Defendant's control.  Plaintiff testified that

Kunwar instilled fear in him by regularly referring to him as "khusra" and "heejra" derogatory

terms in Urdu, synonymous with "faggot" and used to denigrate gay men in Pakistan.  Pl. Dep. at

209:16-20, 210:4-12.  Plaintiff experienced trauma several times on account of his sexual

orientation, in particular the attack which killed his partner and severely injured him, resulting in

his fleeing Pakistan.  Plaintiff's immigration status, socioeconomic status, cultural background,

English language ability, and the power imbalances between worker and employer all contribute

to the reasonableness of his response to Defendant's actions.  The Court will not balance these

factors and make a determination about the reasonableness of Plaintiff's response.  Plaintiff is

entitled to have a jury make such a credibility determination.

Defendant Kunwar points to the fact that Plaintiff was once fired from VHC, and then

asked to return to work, that he had gay friends, Canadian citizenship, an education, and his own

apartment as proof of the absence of coercion.  These arguments raise factual disputes and

amount to credibility attacks, which are not for this Court to decide on summary judgment.  The

question of whether a reasonable person, with Plaintiff's particular vulnerabilities would have

felt coerced by the Defendant's conduct will be left for the jury to decide.  Accordingly,

Defendant Kunwar's motion for summary judgment on Plaintiff's forced labor claims is

DENIED.

### III.   Plaintiff's Trafficking Claims Under the TVPRA

Defendant Kunwar also moves to dismiss Plaintiff's Trafficking Claims under the

TVPRA asserted against her.  Section 1590 provides for liability against any person who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services" for purposes of forced labor or involuntary servitude.  18 U.S.C. § 1590.

Defendant argues this claim must be dismissed because there is no evidence Defendant brought Plaintiff to the United States.  The parties agree that Plaintiff entered the United States for the first time almost a decade before he ever met Defendants and that Defendants had no involvement in Plaintiff's migration.  While trafficking claims brought under § 1590 "generally require[] some conduct that occurs abroad," *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 454 (E.D. Va. 2015), "[t]here is no requirement in either sections 1589 or 1590 that victims be brought into, or recruited from outside, the United States.  Indeed, the statutes do not even require that the victims be foreign-born." *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir. 2019) (internal citations omitted).   Therefore, the fact that Plaintiff was already present in the United States when he first met Defendants is not dispositive.

Plaintiff argues Defendants "concealed, housed, or shielded" him from detection and as a consequence, "harbored" him in violation of § 1590.  *Martinez v Calimlim*, 651 F. Supp. 2d 852, 859 (E.D. Wis. 2009).  To support this contention, Plaintiff points to the fact that Defendants were aware of his immigration status from the original interview, hired him, and payed him in cash to conceal his presence from immigration authorities.  However, this conduct does not satisfy the definition of "harboring" under § 1590.

Unlike involuntary servitude or force labor claims, which focus on the illicit means of maintaining subjugation, trafficking claims under Section 1590 focus on how a victim was initially subjugated.  *See e.g. Adia v. Grandeur Mgmt., Inc.,* 933 F.3d 89, 94 (2d Cir. 2019) (holding plaintiff alleged trafficking in addition to a forced labor claim "based on the allegation

related to his recruitment.").  In this context, § 1590's prohibition against "harboring" must refer to "harboring" for the purpose of obtaining—but not maintaining—forced labor.  Otherwise, trafficking claims involving "harboring" would be indistinguishable from involuntary servitude or forced labor claims.

Because trafficking claims under § 1590 target illicitly obtained labor, Kunwar's motion for summary judgment on this claim must be granted.  First, Plaintiff cannot maintain a § 1590 claim based on his initial recruitment, as he was hired prior to 2003, when the right of action under the TVPRA was established.  *Ditullio*, 662 F.3d at 1091.  Regardless, Plaintiff himself testified that he was not coerced into taking the job at VHC and that he voluntarily accepted the offer of employment despite feeling uneasy about his initial interview.  Pl. Dep. 64:8-10 ("Q: Did anyone pressure you to take the job at VHC? A: No.").  Without an allegation that Defendants *obtained* Plaintiff's labor in violation of the TVPRA, Plaintiff's trafficking claim is his forced labor claim restated.  *See Shuvalova v. Cunningham,* 10-CV-02159, 2010 WL 5387770, at *4 (N.D. Cal. Dec. 22, 2010) (holding that plaintiffs failed to state a distinct claim for trafficking, as opposed to forced labor, where the only allegations regarding defendants' conduct prior to plaintiffs' arrival at the property were that one defendant "promised to take care of [plaintiffs] in a loving home" (internal quotation marks omitted)).  Accordingly, Defendant's motion for summary judgment on Plaintiff's trafficking claim, arising under § 1590 of the TVPRA, is hereby GRANTED.

## IV.    Plaintiff's Document Servitude Claim Under the TVPRA

Plaintiff maintains that Defendants engaged in Document Servitude under the TVPRA by taking possession of his passport.  A defendant is liable for Document Servitude when he or she "knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported

passport or other immigration document, or any other actual or purported government identification document, of another person" in the course of another violation of the TVPRA.  18 U.S.C. § 1592.

Based on Plaintiff's deposition testimony, Choudry took Plaintiff's passport for approximately six years, from 2002 to 2008.  Pl.'s Dep. at 163:13-163:19.  There is no testimony that Kunwar ever took Plaintiff's passport or was aware of Choudry's conduct.  Additionally, Plaintiff testified that he never discussed his passport with Kunwar.  Pl.'s Dep. at 166:23. Accordingly, even construing the facts in the light most favorable to the Plaintiff, as the Court must do on this motion, no cause of action for document servitude lies against Kunwar.

Furthermore, no cause of action for document servitude lies against Defendant Kunwar because the right to bring a civil action for document servitude under the TVPRA did not exist until December 23, 2008.  *Velez v. Sanchez*, 693 F.3d 308 (2nd Cir. 2012).  Because the seizure occurred before the private right of action was created, and the right is not applied retroactively, no claim for document servitude is actionable against Defendant Kunwar.  *Ditullio*, 662 F3d. at 1091.  Accordingly, Defendant's motion for summary judgment on Plaintiff's document servitude claim is hereby GRANTED.

## V.   Improper Benefiting from Trafficking under the TVPRA

Plaintiff also alleges Kunwar improperly benefited from a violation of the TVPRA.  The TVPRA provides that:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of section 1581(a), 1592, or 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation, shall be fined under this title or imprisoned in the same manner as a completed violation of such section.

18 U.S.C. § 1593A.  In addition to being a direct perpetrator of the abuse of Plaintiff, a jury could reasonably find that Kunwar knowingly benefited from Plaintiff's labor.  The record

indicates Kunwar benefited both from Plaintiff's work at VHC and from the domestic services he provided in Defendants' home.  Kunwar herself testified that her family's income was derived entirely from VHC.  Deposition Transcript of Tayyaba Kunwar ("Kunwar Dep."), ECF No. 46-1 at 42:11-16.  Furthermore, Plaintiff testified that he shopped for groceries, cleaned, and gave Kunwar massages upon request, among other domestic services.

Defendant argues Kunwar was not involved in the day-to-day management of the store and that liability cannot be established by "association alone."  Defs.' Mem. at 25.  First, the record indicates that Kunwar contributed directly to the abuse perpetrated against Defendant by threatening him with deportation and physical violence and by referring to him by derogatory slurs.  Regardless, anyone who benefits from involuntary servitude or forced labor in their own home cannot avoid liability by claiming ignorance.  *See Sabhnani*, 599 F. 3d at 242 (upholding conviction as to wife and finding "jury clearly had more than ample evidence from which to infer [wife's] awareness" of abuse in part because abuse frequently occurred in her home.).  At the very least, Plaintiff's allegations raise a genuine disputes of material fact barring summary judgment.  Accordingly, Defendant's motion for summary judgment on Plaintiff's claim arising under § 1593A of the TVPRA is hereby DENIED.

**VI.   Plaintiff's Conspiracy Claims under the TVPRA**

Plaintiff also alleges Defendants engaged in a conspiracy to subject him to forced labor. The TVPRA extends liability to whoever conspires with another to engage in forced labor, trafficking, or document servitude. 18 U.S.C. § 1594(b).  Having dismissed Plaintiff's trafficking and document servitude claims as asserted against Defendant Kunwar, conspiracy liability for those claims fail.  However, Plaintiff's conspiracy claims with respect to his forced labor claims proceed.

Conspiracy requires an agreement to violate the prohibition on forced labor, but there need not be proof of an explicit agreement.  The evidence must allow the jury to infer that the conspirators entered into a joint enterprise and were aware of its general nature and extent. *Paguirigan,* 2019 WL 4647648, at *20; *see United States v. Svoboda*, 347 F.3d 471, 476–77 (2d Cir. 2003) (noting the existence of a criminal agreement between two persons can be inferred from "circumstantial evidence") (quoting *United States v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001)).  Plaintiff testified that from the very outset, both Defendants were involved in directing his labor.  This Court finds the allegations in the record sufficient for a jury to find both Defendants consciously agreed to subject Plaintiff to forced labor in violation of TVPRA. Accordingly, the conspiracy claims asserted against both Defendants, with respect to the forced labor claims, proceed.

### VII.   Plaintiff's NYLL Claims

Finally, Plaintiff alleges Defendants violated New York Labor Law § 215, which makes it unlawful to retaliate against an employee because he has brought a claim against the employer. Under the NYLL "corporate officers with operational control over employees and the corporation itself . . . fit the definition of 'employer.'"  *Romero v. Floris Construction, Inc.*, 16-CV-4282, 2017 WL 5592681, at *5 (E.D.N.Y. Nov. 20, 2017) (Chen, J.).  Employers are jointly and severally liable for retaliatory acts.  *See, e.g.*, *Jones v. Pawar Bros. Corp.*, 434 F. Supp. 3d 14 (E.D.N.Y. 2020) (Chen, J.) (permitting retaliation claims to proceed against individual defendants where only one individual defendant took part in retaliatory acts and leaving it up to the jury to determine whether both defendants could be considered employers).

Defendant Kunwar seeks to dismiss Plaintiff's NYLL claim against her because, she argues, Kunwar was not Plaintiff's employer under the NYLL and was not directly involved in

the retaliatory acts taken by Choudry.  Because employers are jointly and severally liable for retaliatory acts, the fact that Kunwar was not directly involved in the intimidation is not dispositive.  The remaining question is whether Defendant Kunwar was a corporate officer with operational control over employees and the corporation itself.  At the very least, material factual disputes preclude summary judgment on this claim.  While Defendant Kunwar argues she was not involved in VHC, Plaintiff testified that Kunwar would come into the store and direct him to do certain things.  Additionally, Plaintiff testified that at his initial meeting, Choudry would not go forward with beginning the interview until Kunwar arrived, signifying her involvement in VHC hiring decisions.  Additionally, Kunwar was listed as a corporate officer of VHC on documents filed with the state.  Therefore, despite the fact that Plaintiff testified Choudry controlled his salary and was most often responsible for directing the conditions of his employment, material factual disputes exist regarding whether Kunwar qualifies as Plaintiff's employer under the NYLL.  Accordingly, Defendant's motion for summary judgment as to this claim is hereby DENIED.

## **CONCLUSION**

For the reasons stated above, Defendant Kunwar's motion for summary judgment is GRANTED in part and DENIED in part.  The Clerk of Court is respectfully directed to close the motion pending at ECF Nos. 45–47.

**SO ORDERED.**

**s/ WFK**

_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: April 30, 2021
       Brooklyn, New York

22